FILED
2015 Feb-09  AM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **RONALD L. STANLEY** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:13-CV-1969-KOB** |
| | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION**

I. INTRODUCTION

On August 19, 2009, the claimant, Ronald L. Stanley, protectively filed a Title II application for a period of disability and disability insurance benefits. He also protectively filed a Title XVI application for supplemental security income on August 19, 2009. The claimant alleged disability commencing April 12, 2009.  The Commissioner denied these claims initially on March 8, 2010.  On April 1, 2010, the claimant filed for a hearing before an Administrative Law Judge, and on January 26, 2010, the claimant testified at a hearing in front of an ALJ. (R. 15).

In a decision dated March 5, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, not eligible for supplemental security income. (R. 21-

20). On August 30, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. § § 405 (g) and 1383(c)(3). For the reasons stated below, this court REVERSES the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents one issue to the court: whether the ALJ substituted her own judgment for the judgment of medical professionals and failed to provide substantial evidence supporting her decisions about the severity of the claimant's mental impairments.

## III. STANDARD OF REVIEW

The standard for reviewing the ALJ's decision is limited. This court must affirm the ALJ's decision if the ALJ applied the correct legal standards and if substantial evidence supports the factual conclusions of the ALJ. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's Residual Functional Capacity, and the application of vocational factors "are

2

not medical opinions, . . . but are, instead, opinions on issues reserved to the ALJ because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the claimant  meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, re-weigh the evidence, or substitute [its] judgment for that of the ALJ." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set
    forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When a claimant offers a "colorable claim of mental impairment," the ALJ "must complete a Psychiatric Review Technique Form [PRTF] . . . or incorporate its mode of analysis into his findings and conclusions." *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005). The PRTF requires the ALJ to evaluate how the claimant's mental impairment affects four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* at 1213. The ALJ must also make a specific finding within each category detailing the degree of limitation rated as: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520(a)(e)(4). Additionally, the ALJ has an obligation to identify the evidence she used to determine the claimant's mental impairments. *Id.*; *see Moore*, 405 F.3d at 1214.  An ALJ's failure to properly evaluate the claimant's degree of limitation and detail the factors that led to her conclusion requires the court to remand. *See Moore*, 405 F.3d at 1214.

When evaluating the claimant's impairment, the ALJ must take care to base her opinion upon substantial evidence. While the RFC is not a medical assessment, and the ALJ may reject even the opinion of a treating physician, she must provide evidence supporting her contrary finding. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). The ALJ may not substitute her judgment for the judgment of the examining physicians and draw her own uninformed conclusions about the claimant's medical records. *Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986). The ALJ commits a reversible error if she does so. *Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991).

## V. FACTS

The claimant has an eighth grade education and was thirty-three years old at the time of the administrative hearing. He alleges his disability started April 12, 2009. (R. 176-84). Prior to his alleged disability, the claimant most recently worked at Bojangles and American First Mortgage. (R. 35). He lost his job filling paperwork at American First because the company went out of business. (R. 41). Then, he had to quit his job at Bojangles because he could not stand for the entire shift as required by his position as a cashier.  Additionally, he had trouble counting change and handling money.  (R. 35-36).

### *Mental Limitations*

On July 26, 2011, the Huntsville Hospital Emergency Department admitted the claimant for a psychological evaluation after he presented himself in the emergency room with the chief complaint of a desire to kill himself. Tarak M. Vasavada, M.D., a board certified Psychiatrist, evaluated the claimant and diagnosed him with major depression, recurrent and severe, without psychotic features. Dr. Vasavada prescribed the claimant the anti-depression drugs Celexa and Trazodone to take at night. (R. 532-33). Testing at the hospital also revealed the claimant had marijuana in his system. (R. 537).

On August 2, 2011, the claimant visited the Mental Health Center of Madison County. While he was there, Chris Ross, Medical Social Worker (MSW) and Licensed Graduate Social Worker (LGSW), conducted an initial mental status examination. Mr. Ross noted that the claimant was tearful during the session, recounted his past sexual abuse by his stepfather, and stated that he had been unable to work or have any social interactions because of his depression

and anxiety. Mr. Ross also noted that the claimant felt he needed help and "[could not] go on like this" anymore. Mr. Ross concluded his assessment by scheduling the claimant for an appointment on August 5, 2011, with Jennifer Diaber, Licensed Profession Counselor (LPC). (R. 415).

On August 5, 2011, Ms. Diaber conducted a ninety minute long psychological assessment of the claimant. Ms. Diaber noted that the claimant appeared casual during the exam, was open and informative, had clear speech with some paranoid ideation, and had some auditory hallucinations. The claimant's symptoms included flash backs; nightmares; reliving past trauma; isolation from others; difficulty having loving feelings; angry outbursts; sleep and appetite distribution; feeling of helplessness and worthlessness; low energy; lack of motivation; sadness; mistrust of others; paranoid thoughts; auditory hallucinations; difficulty concentrating; and a negative outlook regarding his future. She noted that his goal for therapy was to "get past what I have been going through, talk with someone about what happened, not think about suicide, and learn how to cope with what I am going through."  When asked about his legal history, the claimant told Ms. Diaber that he had been arrested for rape after being accused by a fifty year old man but that police dropped the charges three years later. He mentioned no other incidents. Ms. Diaber deferred diagnosis but gave a clinical impression of Major Depressive Disorder, recurrent severe, with psychotic features, and a GAF score of 50, indicating serious symptoms or any serious impairment in social, occupational or school functioning. (R. 463-64).

On September 19, 2011, the claimant returned to the Mental Health Center of Madison County for a follow-up appointment that lasted sixty minutes. Kori Nitchen, LPC, National Certified Counselor (NCC), conducted the examination. She noted that the claimant interacted well with her, dressed appropriately, and maintained adequate eye contact. She also noted that the

claimant was open to therapeutic intervention but reported still feeling depressed and having flash backs of sexual abuse as a child. The claimant also denied having suicidal or homicidal ideation. Ms. Nitchen concluded that the claimant was making fair progress toward decreasing his depression; however, it would be "medically necessary" to continue treatment to increase his level of functioning. (R. 498).

On November 3, 2011, Alan Piha, M.D., a board certified Psychiatrist and Geriatric Psychiatrist, conducted a thirty minute adult psychiatric assessment of the claimant at the Mental Health Center of Madison County to monitor the claimant's progress. Dr. Piha noted that the claimant felt empty, feared abandonment, did not have relationships, had difficulty with emotions, got "scared around people," and had self-mutilated previously. Dr. Piha also noted that the claimant attempted suicide once in 1994 by cutting himself. He further noted that the claimant denied previous jail, prison, or legal history. The claimant reported that he did not want to kill himself but was working toward improving his disability. Dr. Piha noted that his impression was Major Depression and borderline traits. He stopped the claimant's Paxil and Trazodone prescriptions because the claimant complained that they were not working, and he prescribed Remeron in their place. (R. 493-497).

On November 9, 2011, the claimant returned to the Mental Health Center of Madison County for another follow-up appointment. Ms. Nitchen conducted the thirty minute session. She found that the claimant was open to therapeutic intervention. She also noted that he reported he had a Social Security disability hearing, but that the Social Security Administration needed more information about his past treatments. The claimant also stated that "the judge would like me in therapy" and that he did not know what he would do if he failed to obtain disability benefits. He

7

reported taking his medications; however, he complained that they made him tired during the day. Ms. Nitchen concluded that the claimant was making little progress towards decreasing his depression, and that continued treatment was "medically necessary" for him to increase his level of functioning. (R. 492-93).

On November 11, 2011, the claimant visited the South Care Clinic. He complained of pain on his right side and asked Dr. Edward Witt, a board certified Family Medicine physician, to treat him for anxiety and depression. He also complained of panic attacks. Unfortunately, illegible handwriting prevents the court from deciphering what plan of action Dr. Witt took or recommended. (R. 479).

On December 10, 2011, Dr. Eddie L. Huggins, Jr., a psychiatrist, at the request of the Social Security Administration, completed a psychiatric evaluation of the claimant. The claimant reported that he had no legal problems, and Dr. Huggins found that the claimant was oriented to person, place, and time. The claimant spelled "world" as "wolrd" and spelled it backwards as "drlow;" his short term memory was poor, his mood anxious and depressed; his insight fair at best; and he was unable to make reasonable work-related discussion on a consistent basis. Dr. Huggins opined that the claimant suffered from depression and PTSD. He concluded that the claimant could not maintain gainful employment, and that the claimant was unlikely to make appreciable change within the next six to twelve months. (R. 501).

On January 7, 2012, at the request of the Social Security Administration, Dr. Huggins also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). Dr. Huggins noted that the claimant had marked limitations in his ability to understand and remember simple instructions; carry out simple instructions; make judgments on simple work-related

decisions; understand and remember complex instructions; and make judgments on complex work-related decisions. Dr. Huggins also noted marked limitations on the claimant's ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting. Dr. Huggins did not identify the factors that supported his assessment. Additionally, the record does not reflect whether the January 7 report refers to the examination that occurred on December 10, 2011, or to a new examination that occurred on the date of the report. (R. 504).

## VI. ALJ HEARING

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. The claimant testified that his problems being around people stemmed from his troubled childhood. (R. 36). Specifically, he testified that he was molested by his step-father, that he floated between his separated father and mother, and that his grandmother was abusive towards him. (R. 37). He also testified that he had suffered psychological problems all his life and had previously sought therapy for his condition. (R. 36).

The ALJ next asked the claimant why he mentioned the rape charges he faced in 2006 but did not mention his felony theft conviction when answering questions about his legal history during a visit to the Mental Health Center of Madison County in August 2011. (R. 37). The claimant testified that he did not withhold information but told both the first man that he spoke with at the Center as well as his therapist about his conviction. (R. 38). The ALJ then asked the claimant when he last used marijuana, and the claimant testified that did not use marijuana. When asked how he tested positive for marijuana during his visit to Huntsville Hospital on July 26,

2011, the claimant testified that he had been in a room when friends used marijuana, but that he did not use any. (R. 37).

The claimant testified that he could no longer work because of his depression, PTSD, and leg pain. He also testified that he has to walk with a cane, he cannot stand more than five to ten minutes, and he suffered severe pain just sitting in the chair at the hearing. (R. 45). In addition to his leg pain, the claimant testified that he suffered from daily headaches starting from the moment he wakes up, daily flashbacks about his molestation as a child, and hearing voices. (R. 50-51). He further testified that he had difficulty concentrating because his mind went in so many different directions that he could not even remember some of what he did five minutes previously. (R. 53).

After the claimant finished testifying, the ALJ examined the Vocational Expert, John McKinney. Mr. McKinney testified that the claimant's past work as a fast food worker (DOT # 311.472-010) was light and unskilled, and that his past work as a mortgage processor (DOT # 211.367-018) was sedentary and skilled. (R. 60-61). However, he noted that based upon the claimant's description of his job as a mortgage processor, the job the claimant might have actually performed was probably closer to that of an office helper (DOT #239.567-010), a job classified as light and unskilled. (R. 64).

The ALJ then posed three hypotheticals to Mr. McKinney. In the first hypothetical, the hypothetical claimant, Mr. Alpha, had the same education, training, and work experience as the claimant and could not climb ropes, ladders, or scaffolds. Mr. Alpha must be afforded the opportunity to sit or stand during the workday for one or two minutes every hour; would be limited to casual, non-intensive interaction with co-workers and the general public; would not be required to do any prolonged reading for content or comprehension; and would not be required to

10

do any mathematical calculations. Mr. McKinney testified that the claimant could not perform any of his past jobs because the fast food job would require extensive public interaction and the mortgage processing job would require mathematical calculations and some reading in excess. However, the claimant could perform the job of an office helper under the limitations of the ALJ's hypothetical. (R. 63).

The second hypothetical posed the same limitations; however, the hypothetical claimant, Mr. Beta, would be additionally limited to simple, routine, repetitive tasks not performed in a fast-paced production environment. Mr. McKinney testified that, under these limitations, the claimant's previous job as an office helper would be the only past job he could perform, but he did not comment on how many jobs were available in the regional or national economy. (R. 65).

Finally, the ALJ posed a third hypothetical in which the hypothetical claimant, Mr. Charlie, faced the same limitations as Mr. Beta except that he was not able to concentrate or remain on tasks for two hours at a time sufficient to complete an eight-hour workday without additional breaks. Mr. McKinney testified that the claimant could not perform any of his previous work, or any work at all, if he could not stay on task for a two-hour time-period. (R. 65).

## VII. ALJ OPINION

On March 5, 2012, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 22). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through January 1, 2014. Next, she found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (R. 2). The ALJ then found that the claimant's Major Depression without psychotic features qualified as a severe impairment. She also found that while the claimant had been diagnosed with

obesity, posttraumatic stress disorder, a patent foramen ovale post shunting, migraine headache, anemia, and a history of transient ischemic attack, these conditions caused no more than minimal limitations on the claimant's ability to perform work-related activities. Additionally, he found that the record did not support the claimant's allegations of right-sided weakness and paralysis caused by the transient ischemic attacks. (R. 18).

The ALJ then concluded that these impairments did not singly, nor in combination, manifest the specific signs and diagnostic findings required by the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ found that the claimant's mental impairment did not satisfy the criteria of "paragraph B," which requires at least two of the following: marked restrictions of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. In the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, the ALJ found the claimant to have only moderate difficulties. The ALJ also found no episodes of decompensation that had been of extended duration. Finally, the ALJ concluded that the evidence failed to establish the presence of "paragraph C" requirements.  However, she provided no evidence or analysis to support either the "paragraph B" or "paragraph C" findings. (R. 18).

Next, the ALJ found that the claimant has the Residual Functional Capacity to perform a full range of work at all exertion levels but with the following non-exertional limitations: he is limited to occupations which do not require climbing ropes, ladders, or scaffolds; he must be afforded the option to sit or stand during the workday every hour for one to two minutes; he is limited to simple, routine, repetitive tasks not performed in a fast-paced production environment;

he is limited to casual, non-intensive interaction with co-workers and members of the general public; and he cannot be expected to perform work requiring prolonged reading for content and comprehension or mathematical calculation. The ALJ then found that the claimant's medically determinable impairments of chronic, debilitating, mental dysfunction could reasonably be expected to cause the claimant's alleged symptoms; however, the claimant's statements about the severity and persistence of the symptoms were not credible to the extent that they were inconsistent with the ALJ's own Residual Functional Capacity assessment. (R. 19).

To support her conclusion, the ALJ first examined the claimant's medical records from the Mental Health Center of Madison County. She noted that although the claimant's chief complaint during an August 2011 visit was increased suicidal thought, a licensed counselor made note of the fact that the claimant actually denied suicidal thoughts and was oriented times three. She also cited treatment notes taken in November 2011 by Dr. Piha when the claimant told Dr. Piha that he did not have a suicide plan or intent, but did have suicidal ideation when recalling his molestation period. The ALJ then noted that after examining the claimant, Dr. Piha found the claimant to have direct eye contact, appropriate psychomotor activity, slow speech, and a euthymic mood with appropriate effect. The ALJ further noted that the claimant denied abnormal thought content, including suicidal and homicidal thoughts. Finally, the ALJ noted that during the December 2011 visit to Dr. Huggins, the claimant denied all symptoms (including panic attacks) other than depression and worry. (R. 20).[1]

---

[1] The ALJ wrongly attributes the claimant's denial of symptoms to the notes taken by Dr. Huggins, but she correctly cites the source of the comments to the notes taken by Dr. Piha. However, even though the claimant made no recorded comments to Dr. Huggins denying all symptoms except depression and worry, the claimant did make those comments to Dr. Piha within a month of Dr. Huggins' evaluation. (R. 493). Thus, the mistake does not significantly

The ALJ also supported her opinion by discrediting the claimant's testimony.  She noted that, when the claimant requested an additional psychological consultative examination, the claimant told the intake therapist that he was applying for disability and "the judge would like [me] in therapy." She also noted the fact that the claimant inconsistently reported his prior legal history and use of drugs in various hospital visits. Additionally, she noted that the claimant's assertion that he had not smoked marijuana, but was only at a house where his friends were smoking marijuana, further diminished his credibility.  (R. 21).

Finally, the ALJ gave little weight to the opinions of the examining physicians because none of them had the opportunity to examine the claimant on more than one occasion, and they failed to provide objective medical evidence that supported their findings. The ALJ noted that instead of relying upon objective medical evidence, the physicians relied heavily upon the claimant's own subjective complaints; however, the ALJ also noted that she had already discounted the claimant's subjective testimony. Thus, she concluded that, because the physicians relied heavily upon the claimant's subjective complaints, and she did not find those subjective complaints to be credible, she found the examining physician's opinions to be only partially credible. (R. 21).

The ALJ concluded by finding that the claimant was capable of performing past relevant work as an office helper, because the job did not require activities precluded by the claimant's Residual Functional Capacity.  Thus, the ALJ found that the claimant was not disabled under the Social Security Act.

---

affect her reasoning.

14

## VII. DISCUSSION

The claimant argues that the ALJ substituted her own judgment for the judgment of medical professionals and failed to provide substantial evidence supporting her decisions about the severity of the claimant's mental impairments. This court agrees.

When the claimant makes a plausible mental impairment claim, the ALJ must complete a Psychiatric Review Technique Form. *Moore*, 405 F.3d at 1214. The ALJ must make a specific finding of none, mild, moderate, marked, or extreme when determining the severity of a claimants impairment with respect to each of the following functional categories: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520(a)(e)(4); *see Moore*, 405 F.3d at 1214. If the ALJ fails to properly explain the reasoning behind her decision and identify the evidence she used to reach her conclusion, the court must remand. *See Moore*, 405 F.3d at 1214.

Even though the ALJ's evaluation of the severity of the claimant's impairment is not a medical assessment, the ALJ must provide evidence supporting her position if she chooses to discount the medical opinion of examining physicians. *Syrock*, 764 F.2d at 1182. The ALJ may not ignore the medical evidence in favor of her own uninformed medical opinions, and choosing to do so establishes grounds for reversal. *Marbury*, 957 F.2d at 840.

The records is replete with evidence supporting the claimant's allegation of a mental impairment severe enough to inhibit his ability to work. On July 26, 2011, Dr. Vasavada diagnosed the claimant with Major Depression, recurrent and severe, and prescribed him anti-depressant medication. On August 5, 2011, Jennifer Diaber, a Licensed Professional Counselor, conducted a ninety-minute evaluation in which she noted symptoms of nightmares, lack of sleep,

15

low energy, mistrust of others, difficulty concentrating, auditory hallucinations, and paranoid thoughts. She gave a clinical impression of Major Depressive Disorder, recurrent and severe, with psychotic features. She also assessed the claimant with a GAF score indicating serious impairment in social, occupational, or school functioning.

Then, on September 19, 2011, Kori Nitchen, a Licensed Professional Counselor and a National Certified Counselor, conducted a sixty-minute examination in which she concluded that the claimant's depression required continued treatment to increase his level of functioning. And, on November 3, 2011, Dr. Piha, a Board Certified Psychiatrist, diagnosed the claimant with Major Depression and borderline traits. Finally, on December 10, 2011, Dr. Huggins, another psychiatrist, examined the claimant and noted poor short term memory; an anxious and depressed mood; fair insight, at best; and an inability to make work-related decisions on a consistent basis. He diagnosed the claimant with depression as well as PTSD, and gave his medical opinion that the claimant could not maintain gainful employment and would not likely make any appreciable change within the next six to twelve months. In an effort to provide additional evidence, Dr. Huggins filled out an additional questionnaire that identified various areas of functioning in which the claimant had marked limitations. In short, all the medical professionals support the claimant's assertion of significant mental impairments, and even the physician to whom the government sent him opined that he could not work.

Although the ALJ may discount a physician's opinion, the ALJ's decision to discount all the medical professionals' opinions without providing any contrary professional opinion or other substantial evidence in favor of her opinion troubles the court. The ALJ attempted to provide evidence that the claimant's impairment was not severe by citing notes in the medical records

16

indicating the claimant was oriented, denied suicidal thoughts, and had direct eye contact and appropriate psychomotor activity; however, the evidence she cited does not necessarily contradict the existence of a severe disability that prevents the claimant from working. Moreover, although Dr. Huggins commented specifically about the severity of the claimant's impairments and their impact on the claimant's ability to work, the ALJ cited no evidence that effectively contradicts Dr. Huggins' opinion or mitigates his findings.

Because the ALJ failed to provide substantial evidence or any opinion by a medical professional to support her contrary finding, the ALJ substituted her own uninformed medical opinion for that of trained professionals.

The ALJ also failed to provide substantial evidence to support her PRTF. The ALJ provided no explanations for her determinations of the degree of limitations the impairment imposed on the claimant in the functional categories as social security regulations required. Rather, she made conclusory statements that the claimant had moderate restrictions in all categories with no analysis or logic for her reasoning at all. Without a proper explanation for the ALJ's conclusion about how the claimant's mental impairments impacted the four functional areas, this court cannot properly review the ALJ's decision. Thus, the ALJ must provide a more thorough explanation for her determination of the degree of the severity of claimant's impairments or otherwise provide substantial evidence to support her conclusion.

IX. CONCLUSION

For the reasons as stated above, substantial evidence does not support the ALJ's decision. Therefore, this court will REVERSE the Commissioner's decision and will REMAND it for the

17

ALJ to determine whether the claimant is entitled to Disability Insurance Benefits or Supplemental Security Income Payments.

DONE and ORDERED this 9th day of February, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE